**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FREDERICK LEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:10-cv-01157** |
| | ) | |
| **NORTHWESTERN UNIVERSITY,** | ) | **Judge Kocoras** |
| | ) | **Magistrate Judge Mason** |
| **Defendant.** | ) | |

**DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL**
**FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a)(3) of this Court, Defendant Northwestern University (the "University") hereby submits this statement of facts in support of its Motion for Summary Judgment. The following facts, accepted as true by the University for purposes of this motion only, are taken primarily from Plaintiff's sworn deposition testimony.[1]

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction of this matter under 28 U.S.C. §§ 1331 and 1367(a). (Ex. A, Answer to Third Amended Complaint ("Answer"), ¶¶ 3-4.)

2.    The allegations of the Complaint involve events occurring within the venue of this Court. (Answer, ¶ 4.)

**THE PARTIES**

3.    Plaintiff Frederick Lee ("Plaintiff") is a Chinese-American residing in Evanston, Illinois. (Answer, ¶¶ 1, 6.) Plaintiff graduated from Niles West High School in Skokie, Illinois

---

[1]    The University disputes a number of statements made by Plaintiff during his deposition. Nevertheless, for purposes of this Motion only, Plaintiff's statements made herein are taken as true. The University reserves the right to challenge Plaintiff's allegations and purported evidence in her Complaint outside the context of this Motion for Summary Judgment.

in 2000. (Ex. B, Deposition of Frederick Lee ("Lee Dep."), 20:15-18.) Plaintiff obtained a bachelor's degree in management and a minor in Human Resources from Purdue University in West Lafayette, Indiana in 2004. (*Id.,* 20:21-22:17.)

4. The University is a private university located in and doing business in Evanston, Illinois. (Answer, ¶ 2.)

**PLAINTIFF'S EMPLOYMENT WITH THE UNIVERSITY**

5. The University hired Plaintiff as a campus police officer in September 2005. (Answer ¶ 5.) During his employment with the University, Plaintiff was typically quiet, reserved, and kept to himself. (Ex. C, Deposition of Jose Aviles ("Aviles Dep."), 30:6-11; Ex. D, Declaration of Steven Stoeckl (Stoeckl Decl.), ¶ 3.)

6. Plaintiff received a job description for police officers upon his hire which, among other things, required him to exercise good and sound judgment, maintain emotional poise under stress, maintain satisfactory working relationships with peers, supervisors, students, faculty, staff and others, and to be mentally fit. (Lee Dep., 38:5-20, 451:22-452:6, Lee Dep. Ex. 2.) Plaintiff acknowledged that the mental fitness requirement is particularly important because police officers carry firearms. (Lee Dep., 451:22-452:10.)

7. As a campus police officer for the University, Plaintiff was a member of the Northwestern University Police Department ("NUPD") and was therefore required to adhere to the Rules and Regulations promulgated by the NUPD ("NUPD Rules"). (Lee Dep., 37:16-24, 56:1-12, Lee Dep. Ex. 4.)

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

11.     In conjunction with his duties as a sworn police officer, Plaintiff was assigned a University-owned locker for purposes of storing his uniform and other NUPD-assigned equipment and supplies. (Lewis Dep., 201:3-6, 320:16-321:9.) The University distributed locks and keys to Plaintiff, and Plaintiff was aware that the locker was NUPD property and that the administration kept copies of the key to his locker. (Lee Dep., 68:23-69:1, 75:20-23; 492:1-7.) Per the NUPD Rules, which Plaintiff received upon his hire, the locker assigned to Plaintiff was accessible to the University and subject to periodic inspection. (Lee Dep. 56:1-12, Lee Dep. Ex.

4 at Rule B.5.a. (LEE 01007).) Plaintiff also received and acknowledged a copy of the University's Employee Handbook. (Lee Dep., 75:24-76:3, Lee Dep. Exs., 5-6.) The Employee Handbook informed Plaintiff that University facilities and equipment provided for use by employees – such as lockers – are University property and are fully accessible to the University at all times. (Lee Dep. Ex. 775:-78:5, Lee Dep. Ex. 5 at LEE 3102.)

## PLAINTIFF'S 2008 COMPLAINT

12.     Plaintiff alleges that some of his fellow officers, Todd Collins ("Collins"), Kasia Smerdka ("Smerdka"), Mark McConnell ("McConnell"), and David Kramarz ("Kramarz"), made what he perceived were racially insensitive remarks during 2006, 2007 and early 2008. (Answer at ¶¶ 13-26, 29-31.) In April 2008, Plaintiff complained to the University's Office of Equal Opportunity and Access ("OEOA"), a subset of the University's Human Resources Department, about some of these alleged comments. (Lee Dep., 109:9-11, 144:16-146:19, Lee Dep. Ex. 20; Ex. F, Deposition of Pamela Pirtle ("Pirtle Dep."), 4:16-22, 25:13-20, 27:2-10.)

13.     Plaintiff suggested to OEOA that he would consider his complaint resolved if he received apologies from the alleged offenders and if NUPD personnel were required to undergo sensitivity training. (Lee Dep., 164:10-165:20; Pirtle Dep., 30:10-31:9.) Plaintiff acknowledged at his deposition that Pam Pirtle, the director of OEOA at the time, came to the NUPD and conducted the training that Plaintiff had requested. (Lee Dep., 165:17-20.) Plaintiff further admitted that each of the officers about whom Plaintiff complained apologized after it was brought to their attention that Plaintiff was offended by their comments and he did not hear any of them make racially offensive comments after April 2008. (Lee Dep., 117:14-21, 118:19-22, 120:24-121:11, 125:10-126:16, 130:17-132:11, Lee Dep. Exs. 15, 17.)

**THE AUGUST 2009 SHOE INCIDENT AND ITS AFTERMATH**

14.     More than a year later, on August 18, 2009 Plaintiff arrived at the NUPD coach house locker room where his University-owned locker was located and observed that three pairs of his shoes were not in the same place he had left them the evening before. (Lee Dep., 218:3-219:21.) Plaintiff immediately concluded that he was being targeted because of his race and somebody must have "intentionally" and "maliciously" moved his shoes. (Lee Dep., 229:6-17, 267:15-24, Lee Dep. Exs. 26, 28.)

15.     Plaintiff immediately reported the incident to the supervisor on duty, Collins, who reported the incident to NUPD's Commander Darren Davis ("Davis") and Chief Lewis. (Lee Dep., 228:15-20; Lewis Dep., 274:13-275:1, Lewis Dep. Ex. 19.)

16.     Plaintiff also wrote a memo to Davis (which he placed in Davis's mailbox after the commander had left for the day) explaining that he believed somebody threw his shoes to various areas of the locker room, and that he believed that he was being targeted due to his racial background. (Lee Dep., 229:13-17, 238:6-240:22, Lee Dep. Ex. 28.) Upon instruction from Chief Lewis, Davis promptly forwarded Plaintiff's complaint to OEOA and commenced his own investigation of its allegations. (Lee Dep., 293:8-295:8; Ex. G, Declaration of Darren Davis ("Davis Decl."), ¶ 4.)

17.     One week later, on August 25, 2009, Plaintiff raised the issue of his shoes during a roll call meeting led by Plaintiff's supervisor, Sergeant Stephen Stoeckl ("Stoeckl") and attended by some of his fellow police officers, Kramarz, Smerdka, Andrew Zarate ("Zarate") and Frank Walsh ("Walsh"). (Lee Dep., 244:19-245:2.) During this meeting Plaintiff stood up and loudly stated that he felt disrespected, that he believed the shoe incident was racially motivated,

and questioned whether Stoeckl, Walsh, Kramarz and Smerdka were involved in the incident. (Lee Dep., 256:22-258:3, 258:12-16, 259:14-15; Stoeckl Decl. ¶ 4.)

18.     Plaintiff admittedly raised his voice during the roll call meeting and acknowledged that Stoeckl asked him to lower it. (Lee Dep., 264:20-22, 271:24-272:7, 285:22-286:19, Lee Dep. Ex. 29 at LEE PROD 756.) In response to the accusations, Smerdka also raised her voice, but followed Stoeckl's directives to lower her voice, unlike Plaintiff. (Stoeckl Decl., ¶ 5.) From his office, Chief Lewis overheard elevated voices while this discussion took place. (Lewis Dep., 102:1-12.)

19.     Because Plaintiff was typically quiet and reserved, Stoeckl was concerned about Plaintiff's behavior during the roll call meeting, which he believed was uncharacteristically angry and hostile, and therefore sent an e-mail communication to Chief Lewis reporting what had occurred. (Lewis Dep., 191:4-12, Lewis Dep. Ex. 10; Stoeckl Decl., ¶ 7.) Chief Lewis read Stoeckl's e-mail and, in conjunction with the elevated voices he had overheard that day, determined that Plaintiff had behaved inappropriately during the roll call meeting. (Lewis Dep., 192:20-193:23, 194:20-195:9, 278:8-16.)

20.     Immediately after the roll call meeting, Plaintiff went to OEOA where an employee named Tasha Shelton conducted an initial intake interview and informed Plaintiff that he would need to meet with the office's investigator, Leah Gidron ("Gidron"). (Lee Dep., 297:12-24.)

21.     Prior to meeting with Gidron, Plaintiff e-mailed Gidron and also gained after-hours access to Gidron's office in order to leave her documents naming fourteen potential witnesses to the shoe incident. (Lee Dep., 234:16-23, 309:24-310:14, 311:17-21, Lee Dep. Exs. 27, 28.) In these documents, Plaintiff explained that he believed that someone "maliciously

threw" his shoes to various areas of the room and that the incident was race related. (Lee Dep. Ex. 28.)

22.     Plaintiff met with Gidron in her office on August 28, 2009. During this meeting, Plaintiff stated that he felt hostility from other NUPD members, but particularly from Kramarz. (Lee Dep., 309:17-23, 313:10-16; Ex. H, Declaration of Leah Gidron ("Gidron Decl."), ¶ 4.) Plaintiff informed Gidron that he believed Kramarz hated him and wanted to fight him. (Lee Dep., 313:17-22.) Gidron asked Plaintiff if he had made any efforts to talk to Kramarz about these feelings, and Plaintiff responded "If someone hates you and wants to kill you, why would you hug the person." (Lee Dep., 315:7-316:6.) Gidron believed that Plaintiff thought Kramarz wanted to kill him. (Gidron Decl., ¶ 4.)

23.     During his meeting with Gidron, Plaintiff became yelled so loudly that Pirtle heard him from down the hall in the OEOA office. (Pirtle Dep., 73:19-75:4.) Worried that something might be wrong, Pirtle stepped into the hall to see what was going on and discerned that Plaintiff was in Gidron's office yelling very loudly and in a hostile and angry fashion. (Pirtle Dep., 65:5-20, 73:19-75:4.) Pirtle believed that this hostile and emotional behavior was quite unusual given her previous interactions with Plaintiff. (Pirtle Dep., 65:7-11.)

24.     Pirtle consulted with Gidron after Plaintiff left her office and Gidron informed her about Plaintiff's apparent belief that Kramarz wanted to harm him, and explained that Plaintiff was very emotionally charged and angry. (Pirtle Dep., 66:17-67:3.) Concerned about Plaintiff's unusual behavior, especially given his typically quiet and reserved demeanor, Pirtle reported the incident to Chief Lewis. (Pirtle Dep., 65:7-11, 73:2-17.)

25.     On September 9, 2009, Plaintiff e-mailed other police officers who worked on his shift stating that he would "not tolerate negativity or disrespect in any way," and that he has

"control" over the way his fellow officers treat him. (Lee Dep., 334:9-336:7, Lee Dep. Ex. 32.) Chief Lewis received notice of this e-mail and interpreted the language as an implicit threat by Plaintiff to his fellow officers. (Lewis Dep., 272:6-18, 307:13-17.)

26.     Gidron fully investigated Plaintiff's complaint by interviewing Plaintiff, reviewing documents, and interviewing 10 witnesses that Plaintiff had identified through his written complaints plus an additional 3 witnesses whom Gidron believed may have had relevant information. (Gidron Decl., ¶ 5; Lee Dep., 327:1-328:19, Lee Dep. Ex. 27.) Gidron issued a report of her findings on October 8, 2009 concluding that Plaintiff's complaints of discrimination were unsubstantiated. (Gidron Decl., at ¶ 5, Ex. 1 to Gidron Decl.)

## PLAINTIFF'S ADMINISTRATIVE LEAVE

27.     Based on Plaintiff's loud and angry behavior during the August 25, 2009 roll call meeting as reported to Chief Lewis by Stoeckl, the September 9, 2009 e-mail which Chief Lewis believed communicated a threat to Plaintiff's coworkers, and the information Chief Lewis received about Plaintiff's meeting with Gidron in which he expressed feelings that his life was being threatened by Kramarz, Chief Lewis was "greatly concerned" that Plaintiff may be at risk of being unable to meet the mental fitness requirements of his position as an armed police officer. (Lewis Dep., 92:6-14, 93:4-10.)

28.     Chief Lewis concluded that, until he could be assured that Plaintiff still met the legal and ethical requirements to be an armed NUPD police officer, he was "duty bound" to place Plaintiff on administrative leave pending the results of a fitness for duty evaluation to be conducted by a professional police psychologist. (Lewis Dep., 157:13-158:4, 171:5-24, 172:1-6, 177:3-14, 178:20-179:16.)

8

29.     Thus, on September 10, 2009, Deputy Chief Daniel McAleer ("McAleer") met with Plaintiff and gave him a letter explaining that Plaintiff's conduct over the past several weeks violated the NUPD's Courtesy Rule, and stating that Chief Lewis ordered Plaintiff to undergo a fitness-for-duty evaluation for purposes of evaluating Plaintiff's capability to offer armed, independent law enforcement duties. (Lee Dep., 433:23-434:7, Lee Dep. Ex. 33; Lewis Dep., 89:12-17, 99:17-19, 100:13-15, Lewis Dep. Ex. 6.)   The letter specifically informed Plaintiff that if he "refuse[d] to participate fully in the evaluation or decline[d] to cooperate in any way, [his] behavior will be considered insubordination." (Lewis Dep. Ex. 6.)

30.     Chief Lewis did not mention Plaintiff's outburst to Gidron in the letter as one of the reasons he decided to take this action because he was concerned for Gidron's safety and, not knowing how Plaintiff would react to being placed on leave and required to undergo a fitness for duty evaluation, he did not want to identify specific individuals. (Lewis Dep., 158:6-159:6.)

31.     During the meeting between Plaintiff and McAleer on September 10, 2009, McAleer instructed Plaintiff that he was not to enter campus property during his administrative leave. (Lee Dep., 436:7-19.) McAleer further instructed Plaintiff not to speak to anybody affiliated with the University about circumstances surrounding his administrative leave except for McAleer himself. (Lee Dep., 435:9-436:2, 486:3-7.)

## PROPERTY CONTAINED IN PLAINTIFF'S UNIVERSITY-ISSUED LOCKER

32.     Plaintiff left campus following the meeting on September 10, 2009 without asking to go to his locker to retrieve any belongings from his University-owned locker. (Lee Dep., 439:18-440:8.) While Plaintiff was on leave, Plaintiff left McAleer and a voicemail message asking for the return of personal belongings left in the locker assigned to him by the University. (Lee Dep., 534:16-535:20.) Davis conducted an inventory of Plaintiff's University-issued locker

in order to distinguish University-property from non-University property. (Ex. I, Deposition of Darren Davis ("Davis Dep."), 125:1-2; Lewis Dep., 204:5-11.)

33.     The locker was found to contain over 85 items that were non-University property, including several non-work related notebooks, journals and audio compact discs. (*See* Lee Dep., 507:3-20, 521:11-522:19, 523:4-15, 530:3-13, Lee Dep. Exs. 45-48, 52; *see also* Davis Dep. Ex. 2.) Davis prepared an inventory list of all the items he ascertained were non-University property contained in the locker. (Davis Dep., 20:13-22, Davis Dep. Ex. 2.) Davis did not see any barbells in Plaintiff's locker nor were there any barbells in plain view in the locker room. (Davis Decl., ¶ 7.) Therefore, Davis did not include the barbells in the written inventory list. (*Id.*)

34.     Some of Plaintiff's writings that Davis reviewed have a violent tenor and show blatant disrespect for law enforcement. For example, one of the notebooks Davis reviewed in the locker contained a poem titled "Rules," whose opening line is "Fuck the world and all its rules." (Lee Dep. Ex. 45 at LEE PROD 1153.) The same journal contains another poem called "No Need for Gun Laws," in which Plaintiff wrote, "No need 2 call the cops when I have my Glock. I'll shoot up any crooked motherfucker on the Block . . . I don't need to call some pussy ass Cop." (*Id.* at LEE PROD 1166.)

35.     Davis became concerned by the violent and offensive content of these materials. (Davis Dep., 34:7-13; Davis Decl. ¶ 6.) Thus, Davis copied some of Plaintiff's writings and recordings, and gave them to Chief Lewis. (Davis Dep., 27:11-22, 32:10-22, 34:12-13, 35:1-7, 127:1-5.) Chief Lewis directed Davis to deliver copies of the writings and recordings to Dr. Friedman for his assessment, and Davis did so. (Davis Dep., 18:19-19:15; Lewis Dep., 206:2-6, 265:7-266:8.)

36.     McAleer did not immediately receive Plaintiff's message asking to retrieve his property because he was out of the office.  (Lee Dep., 538:3-539:9.)  At some point after his return, McAleer retrieved Plaintiff's message, returned his phone call and left a message about setting up an appointment.  (*Id*.)  Plaintiff did not retrieve McAleer's message until after his employment with the University had been terminated because his voicemail system had malfunctioned.   (Lee Dep., 180:15-181:18, 535:2-17, 538:3-539:9, Lee Dep. Ex. 23 at LEE PROD 766.)

37.     On October 6, 2009, not having received McAleer's voicemail message regarding setting up a time to retrieve his belongings, Plaintiff e-mailed McAleer asking to enter campus to retrieve his belongings.  (Lee Dep., 537:14-538:2, Lee Dep. Ex. 55.)  In that e-mail, Plaintiff lists a number of specific items he sought to retrieve, but did not list a set of barbells.  (Lee Dep., 541:10-542:5, Lee Dep. Ex. 55.)

38.     In response to Plaintiff's October 6, 2009 e-mail, McAleer called Plaintiff on the telephone and asked him to come to the University to retrieve his belongings.  (Lee Dep., 535:14-17.)  Plaintiff refused to enter campus without his attorney present, and did not go to campus to retrieve his belongings.  (Lee Dep., 535:18-24.)

**PLAINTIFF'S FITNESS FOR DUTY EVALUATION**

39.     On September 14, 15 and 18, 2009 Plaintiff met with Dr. Friedman for purposes of the fitness for duty evaluation, which included three one-on-one interviews, an intake questionnaire, and three written standardized personality tests.  (Ex. J, Deposition of Alan Friedman, Ph.D. ("Friedman Dep.") Vol. I, 40:12-14, 67:3-5, 91:20-92:3,  Ex. K, Friedman Dep. Vol. II, 101:16-19, Friedman Dep. Vol. II Ex. 6 at LEE 1130.)  Dr. Friedman has a Ph.D. in clinical psychology.  (Friedman Dep. Vol. I, 5:17-6:11.)  Dr. Friedman has conducted fitness for

duty evaluations for law enforcement organizations throughout the course of his 30-year career and has authored books and articles on workplace violence, threat assessments and fitness for duty violations. (Friedman Dep. Vol. I, 7:12-8:17, 56:19-21, Vol. II, 10:16-19.)

40.     At the beginning of the initial meeting on September 14, 2009, Dr. Friedman explained that the evaluation was truly voluntary, but that if Plaintiff chose to stay and complete the evaluation, it was important that he fully cooperate with the exam and that all responses to questions, either written or verbal, must be truthful and accurate. (Friedman Dep. Vol. I, 91:6-19.) Plaintiff signed a written release specifically acknowledging the foregoing. (Lee Dep., 457:7-18, Lee Dep. Ex. 34.)

41.     Dr. Friedman observed that Plaintiff's behavior throughout the fitness for duty evaluation process was defensive and guarded. (Friedman Dep. Vol. I, 56:13-15.) For example, Plaintiff took notes throughout the evaluation, which Dr. Friedman testified was highly unusual based on the fact that he had never witnessed anybody do this in any of the hundreds of fitness for duty evaluations he had administered over the course of his more than 30-year career. (Friedman Dep. Vol. I, 56:16-57:1; Lee Dep., 469:9-470:12, Lee Dep. Ex. 37.) Dr. Friedman opined that Plaintiff's taking notes suggested he was highly defensive and guarded. (Friedman Dep. Vol. I, 56:13-57:5.) In addition, Plaintiff acted suspicious of Dr. Friedman and was unusually reluctant to answer his verbal questions without prodding. (Friedman Dep. Vol. I, 65:4-66:21.)

42.     Plaintiff did not honestly answer all of the questions posed to him during the fitness for duty evaluation. (Friedman Dep. Vol. II, 104:14-19.) For example, Plaintiff denied any stress whatsoever, despite the fact that he had reported feeling targeted and uncomfortable in his work environment. (Friedman Dep. Vol. I, 140:2-141:7.) Plaintiff's dishonesty on this point

is further demonstrated by the fact that in the notes he took throughout the fitness for duty evaluation, he wrote *six* times that he was experiencing "severe emotional distress" at the exact same time he told Dr. Friedman that he was not experiencing any stress whatsoever. (Lee Dep., 464:20-465:1, 469:9-470:12, Lee Dep. Ex. 37.)

43.     Plaintiff took two tests during the first session of his fitness for duty evaluation on September 14, 2009, the MMPI-2 and the PAI. (Lee Dep., 471:14-472:7.) Plaintiff failed all of the built-in validity scales on these tests that measure honest test taking. (Friedman Dep. Vol. I, 64:7-23.) For example, as Friedman subsequently reported to Chief Lewis, Plaintiff's scores on the MMPI-2 showed gross elevation on the examination's "Lie" scale and "Superlative" scale as well as the "Positive Malingering" scale. (Lewis Dep., 300:3-10, Lewis Dep. Ex. 21.) Taken together, these elevated scales suggested to Dr. Friedman that Plaintiff did not approach the test in a candid and honest way. (*Id.*) Similarly, Plaintiff's scores on the PAI "Positive Impression Management" scale invalidated the test and the computerized results narrative indicated that Plaintiff was defensive in his responses. (*Id.;* Friedman Dep. Vol. II, Ex. 6 at LEE 1132.) Dr. Friedman testified that Plaintiffs' results on all three tests were very rare in his experience. (Friedman Dep. Vol. II, 37:21-38:1.)

44.     As Plaintiff wrote in his contemporaneous notes of September 15, 2009, on the second day of Plaintiff's fitness for duty evaluation, Dr. Friedman explained to Plaintiff that the test results from the MMPI-2 indicated that Plaintiff was very defensive and made him appear superhuman. (Lee Dep., 271:24-272:7, 469:9-470:12, Lee Dep. Ex. 29 at LEE PROD 762 and Lee Dep. Ex. 37 at LEE PROD 35.) Plaintiff subsequently took another test, the M-Pulse, but the blind computerized results of that examination revealed an extremely elevated "Impression

Management" Scale score, again showing that Plaintiff was, again, not cooperating in answering honestly on the inventory. (Lee Dep., 472:2-7; Friedman Dep. Vol. II, Ex. 6 at LEE 1132.)

45.     Given the results of the psychological testing and Plaintiff's demeanor throughout the evaluation, Dr. Friedman determined that Plaintiff's attendance and answering test questions was mere "superficial" compliance, and in reality Plaintiff did not cooperate with the FFD evaluation process. (Friedman Dep. Vol. II, 88:3-9, Ex. 6 at LEE 1133.) Ultimately, Dr. Friedman could not make a finding of fitness for duty because Plaintiff's defensiveness and lack of honesty showed that he did not cooperate with the fitness for duty evaluation. (Friedman Dep. Vol. I, 84:5-18, Vol. II 41:6-23, 84:20-86:2.)

46.     On September 22, 2009, Dr. Friedman wrote Chief Lewis a letter describing Plaintiff's fitness for duty evaluation and the conclusions he had reached. (Lewis Dep., at 291:14-22, Lewis Dep. Ex. 21.) Dr. Friedman described Plaintiff's guarded demeanor and explained that he did not believe Plaintiff's behavior was "consistent with honest disclosure." (Lewis Dep., 299:24-300:10, Lewis Dep. Ex. 21.)

47.     Dr. Friedman further explained to Chief Lewis that the results of all three of the psychological tests he administered to Plaintiff, which were blindly scored, were invalid because Plaintiff did not cooperate by answering the test items in candid and honest fashion. (Lewis Dep., 300:3-10, Lewis Dep. Ex. 21.) In sum, Dr. Friedman wrote that, Plaintiff did not truly cooperate and, therefore, Dr. Friedman was unable to make a finding one way or the other whether Plaintiff was fit for duty at that time. (Lewis Dep. Ex. 21.)

## CHIEF LEWIS'S DECISION TO TERMINATE PLAINTIFF

48.     In his capacity as Chief of Police, Chief Lewis may recommend termination of NUPD personnel to the Associate Vice President of Human Resources, Pamela Beemer. (Lewis

Dep., 19:3-20:12.)  Associate Vice President Beemer may or may not approve Chief Lewis's request to terminate an NUPD employee's employment.  (*Id.*)

49.     The day after receiving Dr. Friedman's September 22, 2009 evaluation, in reliance upon that report, Chief Lewis had concluded that Plaintiff's employment should be terminated and wrote to Associate Vice President Beemer requesting approval to do so.  (Lewis Dep., 291:14-22, 312:6-313:10, Lewis Dep. Ex. 22.)

50.     Chief Lewis explained to Associate Vice President Beemer that, based on the findings contained in Dr. Friedman's September 22, 2009 letter, it was clear that Plaintiff had violated Chief Lewis's written directives to cooperate fully with the fitness for duty evaluation process and was, therefore, insubordinate.  (Lewis Dep. Ex. 22.)

51.     Furthermore, because Dr. Friedman was unable to certify whether or not Plaintiff was fit for duty, Chief Lewis was unable to consider the possibility of restoring him to full and active duty.  (Lewis Dep. Ex. 22.)  According to Chief Lewis:

> it is imperative that [sworn police officers] meet the guidelines and the provisions to carry a weapon.  This is not discretionary . . . I must always be in a position to attest to their fitness, both physically . . . and mentally, to exercise rational judgment under intense conditions.  So beyond my ethical duty to ensure the safety of the community, the department, and individuals, I also had a legal duty [to ensure Plaintiff's fitness for duty].

(Lewis Dep., 159:20-160:8.)

52.     After reviewing Chief Lewis's request for termination in conjunction with Gidron's report of findings, which was not issued until October 8, 2009, Associate Vice President Beemer approved Chief Lewis's request to terminate Plaintiff's termination on October 15, 2009.  (Ex. L, Declaration of Bruce Lewis ("Lewis Decl."), ¶ 4, Ex. 1 to Lewis Decl.)

53.     Upon receiving Associate Vice President Beemer's approval to terminate Plaintiff, University personnel made attempts to contact Plaintiff's attorney in order to notify him

that his employment had been terminated. (Lewis Dep., 314:20-316:17.) The University wanted to communicate the information through his attorney instead of directly to Plaintiff because it was uncertain about how Plaintiff would react to the information. (Lewis Dep., 316:4-17.)

54. Unable to reach Plaintiff through his attorney, Chief Lewis ultimately sent Plaintiff a letter on October 20, 2009 informing him that his employment was being terminated for insubordination. (Lewis Dep., 316:12-17, Lewis Dep. Ex. 13.)

55. On the same day that Plaintiff received his termination letter, Plaintiff received a box via federal express containing the non-University property that had been stored in the locker along with the inventory list Davis had prepared listing the items being transmitted to him. (Lee Dep., 492:12-23, 495:4-14, Lee Dep. Ex. 42.) Plaintiff admits that none of the items he received back from the University were damaged in any way, and they were all capable of being used for their intended purpose. (Lee Dep., 499:21-500:2.)

56. Plaintiff did not receive back a pair of barbells that he had stored in a closed drawer in the locker room where the locker was located. (Lee Dep., 494:10-24.) Of the property that Plaintiff left on campus while he was on administrative leave, the barbell set is the only property that Plaintiff did not receive back from the University. (Lee Dep., 495:5-15.) The University learned of the existence of the barbell set during discovery in this litigation, and attempted to return the barbell set to Plaintiff. (Davis Decl. ¶ 7; Lee Dep., 495:16-497:7.) Plaintiff refused to accept the barbell set. (Lee Dep., 495:16-497:7.)

57. Plaintiff alleges that an article was published in the Chicago Tribune regarding Plaintiff's claims against the University on October 14, 2009. (Answer at Count I, ¶ 82.) Chief Lewis was notified that an article had been published, but never read the article and was not aware of where the article was published or whether the press received was positive or negative

towards the University. (Lewis Dep., 226:10-16, 240:21-241:24, 248:21-249:7.) Chief Lewis did not take this article into account, nor did he consider any of the conduct Plaintiff alleges were protected activities, when he made the decision to terminate Plaintiff's employment. (Lewis Decl. ¶ 5.)

58. Plaintiff himself believes that Chief Lewis did everything he could to remedy the discrimination he claims to have experienced, in fact he wrote:

> I have spoken personally with Chief Lewis on about 3 occasions in private. We spoke at times for over an hour long. I would voice to him my concerns with the department in regards to discrimination and harassment. He shares many parallel views to mine in regards to fixing the problem. He is a very good and wise man.

(Lee Dep. Ex. 23 at LEE PROD 1062.)

## THE ITEMS CONTAINED IN PLAINTIFF'S LOCKER DURING HIS LEAVE WERE NOT PRIVATE

59. Plaintiff maintains a YouTube "channel" called "Freddie's Modern Kung Fu" at www.youtube.com/user/freddiesmodernkungfu, which contains well over 1,000 video and audio files that are openly available to the public at large. (Lee Dep., 548:3-549:5.) Anyone may access these videos by clicking the links and playing them directly from YouTube. (*See,* http://www.youtube.com/user/FreddiesModernKungFu.) In addition, Plaintiff has published at least three books: *Artistic Wisdom,* which was published under the pseudonym "Wise Flow," *Spiritual Martial Arts* and *Living the Way.* Lee Dep., 525:15-18, 527:17-529:7, Lee Dep., Exs. 49, 50, and 51.

60. The journals Plaintiff claims are private express his ideas on various topics including guns, authority, law, government, capitalism, automobiles, education, fidelity, monogamy, freedom, frugality, god and religion, sexual orientation, love, masturbation, materialism, policing, prostitution, racism, relationships, sex and spirituality, just to name a few. (*See, e.g.,* Lee Dep. Ex. 45 at LEE PROD 1153, 1157, 1160, 1161, 1166 and 1170-73; Lee Dep.

Ex. 46 at LEE PROD 1202, 1204, 1205, 1210, 1212-1214, 1221, 1229, 1232-34, and 1236-1248.) Yet, Plaintiff discusses his ideas on precisely these same topics and concepts in audio and video recordings that Plaintiff posts to YouTube on a regular basis. (*See* Ex. M, Appendix of YouTube Videos (I).)

61.     Plaintiff has also published many of the topics discussed in the journals and recordings contained in the locker in his three books.  Indeed, some of the exact same passages from in his handwritten journals (which Plaintiff alleges were private) appear verbatim in his book "Artistic Wisdom," which was published in 2009, *before* the University ever searched the locker.  For example, one of his journal entries states:

> [S]ince more women have become sexually expressive, they too have begun to pursue the strictly physical relationship with no thoughts for love, care and even monogamy.  So there no longer is a gender that has taken responsibility of controlling the sexual urge for the male/female relationship.  The result is unwanted pregnancies, unwanted babies, increased STDs, higher rates of divorce, higher rates of infidelity, decreased desire for raising family, fear of marriage.  No matter if it is the male or female someone needs to take the responsibility in order for this society to progress.

(Lee Dep. Ex. 46, at LEE PROD 1202.)  This exact passage also appears in *Artistic Wisdom*.

(*See,* Lee Dep. Ex. 50 at p. 212.)

62.     Another passage from Plaintiff's journal opining on a concept Plaintiff has coined "wise promiscuity," also appears verbatim in *Artistic Wisdom*:

> This man states that he truly feels that he is not doing anything wrong by being sexually intimate with other women other than his primary lover.  He states that he believes that society has trained our minds to feel guilty about infidelity when in actuality there is nothing to feel guilty about, it is our minds that make this guilt.  There are certain rules that he does follow.  He states that he would not become sexually intimate with a woman who is married, as he does not wish to be the destroyer of a marriage.  He states that if he has children with his primary lover he will do whatever in his power to be there for his children, even if it means that he must sever all intimate relations with all women other than his primary lover.

(*compare* Lee Dep. Ex. 46 at LEE PROD 1243 *with* Lee Dep. Ex. 50 at p. 237.)

63.     These are just two of multiple examples of Plaintiff publishing verbatim passages from the journals contained in the locker in *Artistic Wisdom*. (*see also, e.g., compare* Lee Dep. Ex. 46 at LEE PROD 1244 ("the government created work to steer our energy derived from our sexual passions. . .") *and* Lee Dep. Ex. 50 at p. 195 ("the oppressors created work to steer our energy derived from our sexual passions . . ."); *compare also* Lee Dep. Ex. 46 at LEE PROD 1212 ("Aside from the obvious negativity associated with being bombarded by advertisements . . .") *and* Lee Dep. Ex. 50 at p. 298 ("Aside from the obvious negativity associated with being bombarded by advertisements . . .).)

**PLAINTIFF'S PURPORTED EMOTIONAL DISTRESS**

64.     Plaintiff testified that he has suffered various symptoms of purported emotional distress including loss of sleep (although he testified he does not have this problem every night, and receives at least 4-6 hours every night), loss of appetite (although he has gained some of the weight he lost back), and diminished quality of relationships with his wife and children. (Lee Dep., at 553:19-557:16, 558:10-24.)

65.     According to Plaintiff, these symptoms have been caused by thinking about this litigation, the discrimination he has alleged against the University, what people think about him, living in Evanston close to the University, Evanston police, and struggles with his family. (Lee Dep., 555:6-15, 557:14-16.) Plaintiff does not claim that the dispossession of his property for six weeks or the search of said property contributed to the emotional distress. (*Id.*)

66.     Plaintiff testified that he has been able to cope with his purported symptoms on his own in various ways, including: gleaning experience from books he has read; drawing on his

own spirituality; healthy eating, exercise, and receiving help from his wife and a couple of close friends. (Lee Dep., 503:12-23, 554:12-18.)

67.     Plaintiff's quality of relationships and life has not been severely diminished. Indeed, following his termination, he has been able to participate in family events, care for his children, and perform physical fitness activities. (Ex. N, 6/1/2011 Certification of Freddie Lee ("Lee Certification") at ¶ 5; Exhibit O, Appendix of YouTube Videos (II); Lee Dep., 558:10-24.) He has talked openly about the excellent quality of his relationship with his wife on his YouTube Channel. (*See, e.g.,* Appendix of YouTube Videos (II) at Line 60.)  Of the more than 1,000 video files that were posted on his YouTube Channel as of Plaintiff's June 1, 2011 Certification, all but one had been created after his termination. (Lee Certification at ¶5.)

68.     Plaintiff often discusses his enlightenment and happiness online, and gives advice to his disciples about achieving those same states of being and coping with depression. (Lee Dep., 556:17-19; Appendix of YouTube Videos (II) at Lines 46-47, 57, 63.)  He also offers online advice about topics such as nutrition and getting adequate sleep. (Lee Dep., 548:10-14, 556:10-19, Appendix of YouTube Videos (II) at Lines 33-34, 36-37, 40-41, 44-59.)  Plaintiff specifically testified that he follows his own advice to the best of his ability. (Lee Dep., at 556:10-23.)

69.     Plaintiff sought professional advice for the purported emotional distress he has suffered only after the University served its First Set of Interrogatories requesting the identity of his mental health care providers, and upon the recommendation of his attorney. (*See,* Ex. P, Plaintiff's Responses to the University's First Set of Interrogatories to Plaintiff at No. 8; Lee Dep., 559:3-11; Ex. Q, Deposition of Lise Schiffer ("Schiffer Dep."), 24:7-13.)  Prior to that, Plaintiff was coping with these purported symptoms on his own. (Lee Dep., 559:9-11.)

70.     Plaintiff met with Dr. Jerry Porzemsky two times, but did not feel comfortable in his environment because his office was cluttered. (Lee Dep., 559:13-22.) Thereafter, Plaintiff found another counselor, Lise Schiffer, LCSW, with whom he met with a total of ten times. (Lee Dep., 559:23-560:7.)

71.     After three visits with Schiffer, Plaintiff stopped talking about his experiences with the University and the focus of the treatment shifted from his job loss to his personal issues. (Lee Dep., 560:8-11; Schiffer Dep., 38:9-18.) Schiffer concluded that Plaintiff was not depressed or anxious, but rather, was experiencing sexual frustration. (Schiffer Dep., 29:19-23, 43:19-23.) Plaintiff did not show signs of low energy and never expressed feelings of hopelessness to her. (Schiffer Dep., 78:18-24, 79:10-14.)

72.     Schiffer concluded that any stress or frustration Plaintiff expressed or deterioration in his relationships was not caused by his job loss. (Schiffer Dep., 39:18-43:3, 90:4-8.) She concluded that his reaction to losing his job was quite normal, and that he seemed quite resilient to her. (Schiffer Dep., 80:17-23, 97:23-98:8.)

73.     In July 2010 Schiffer concluded she could not be of further help to him and suggested they terminate therapy, but that if he needed more support regarding having been terminated, he should call her. (Schiffer Dep., 46:13-47:16.) Plaintiff never called her. (Schiffer Dep., 47:17-18.)

**PLAINTIFF DOES NOT HAVE ANY COMPARATORS**

74.     Plaintiff alleges that Lieutenant Nicholas Parashis ("Parashis") violated the NUPD Courtesy Rule by allegedly belittling subordinates and making purportedly insensitive comments; that Lieutenant Robert Wiley ("Wiley") allegedly violated this rule by raising his voice and using profanity; that Lieutenant Kenneth Jones ("Jones") also allegedly violated this

rule by raising his voice and using profanity; and that Sergeant Haydee Martinez ("Martinez") purportedly violated this rule by raising her voice to subordinates. (Lee Dep., 593:15-597:1.)

75. As lieutenants and sergeants, all of the individuals Plaintiff compares himself are supervisors that are above him in the Chain of Command. (Lee Dep., 44:17-21, 82:13-83:7, Lee Dep. Ex. 7 at LEE 901.)

76. Plaintiff only claims to have witnessed the purportedly improper conduct of Wiley, Jones and Martinez, but admittedly did not report either Wiley's or Jones' purported conduct through the appropriate channels. (Lee Dep., 681:9-683:14.)

███ Plaintiff's allegations with regard to Martinez stem from events that occurred in June 2008, when Martinez reported that Plaintiff and one of his fellow officers, ███████, behaved insubordinately towards her. (Lewis Decl. ¶ 9.) ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████



Dated: <u>December 21, 2011</u>          Respectfully submitted,


                                        By:    <u>*s/ Jenny R. Goltz*</u>
                                               One of the Attorneys for Defendant
                                               NORTHWESTERN UNIVERSITY

Joseph E. Tilson
Anneliese Wermuth
Jenny R. Goltz
MECKLER BULGER TILSON
  MARICK & PEARSON LLP
123 North Wacker Drive, Ste. 1800
Chicago, Illinois  60606
(312) 474-7900 – Telephone
(312) 474-7898 – Facsimile


M:\14092\pleading\NU MSJ\MOT-Sum-Judg. (SOF).redacted.doc