IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREDERICK LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-01157 |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | Judge Kocoras |
| | ) | Magistrate Judge Mason |
| Defendant. | ) | |

**DEFENDANT'S LOCAL RULE 56.1(b)(3)(C) STATEMENT
OF ADDITIONAL UNDISPUTED MATERIAL FACTS
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(b)(3)(C) of this Court, Defendant Northwestern University (the "University") hereby submits this statement of additional facts in opposition to Plaintiff's Motion for Summary Judgment. (Dkt. Nos. 138-145.)

████ Chief of Police Bruce Lewis ("Chief Lewis") is aware that ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████████████

1

[redacted]

5.      Jerry Porzemsky, Ph.D. ("Dr. Porzemsky") is a clinical psychologist who treated Plaintiff on two occasions, May 21, 2010 and May 26, 2010, after which Plaintiff terminated the therapy. (Ex. B, Deposition of Jerry Porzemsky, Ph.D. ("Porzemsky Dep."), 7:3-24, 39:17-40:16.)

6.      Porzemsky specifically testified that he, "did not diagnose [Plaintiff] as depressed." (*Id.*, 28:2-3.) Dr. Porzemsky went on to explain his impression that Plaintiff was "experiencing a depressed mood, depressed feelings" of a mild nature, but was not "severely" impaired or depressed. (*Id.*, 28:13-29:3, 39:2-3.) In fact, Dr. Porzemsky only assumed that Plaintiff was depressed, but could not definitively conclude whether that was the case because he was unable to get enough relevant information and did not know if he got "the real story" from Plaintiff. (*Id.*, 38:4-15.)

7.      Dr. Porzemsky testified he believed that Plaintiff was likely to recover from any mild depressed feelings he was experiencing as a result of the lack of severity of his impairment, and the various resources he had at his disposal including being entrenched in the social network provided by his family. (*Id.*, 38:23-39:16.)

8.      Lise Schiffer, LCSW, ("Schiffer") is a psychotherapist who also treated Lee for a short period of time during June and July 2010. (Ex. C, Deposition of Lise Schiffer, LCSW, ("Schiffer Dep."), 22:11-23:4; 50:5-12, Exs. 1 and 2 to Schiffer Dep.) Schiffer believed that

Plaintiff was having difficulty adjusting to a change in his life, but that his diagnosis was "nonserious." (Schiffer Dep., 30:17-7.) Schiffer also concluded that Plaintiff's prognosis was good, and that she believed he would fully recover from any setback he experienced as a result of losing his job. (*Id.*, 54:12-55:2, Ex. 2 to Schiffer Dep.)

9. Alan Friedman, Ph.D. ("Dr. Friedman"), the psychologist who was retained to administer Plaintiff's fitness for duty evaluation ("FFD"), specializes in fitness for duty and threat assessments for safety sensitive positions such as police and fire personnel, among others. (Exhibit D, Declaration of Alan Friedman, Ph.D. ("Friedman Decl."), ¶ 4.) He regularly consults with law enforcement organizations, one of which is the NUPD, regarding their sworn officers' fitness for duty. (*Id.*, ¶ 4.)

10. As part of Plaintiff's FFD, Dr. Friedman reviewed a number of documents provided to him by the University which provided relevant background information regarding the need for the evaluation such as copies of reports of Plaintiff's uncharacteristic and bizarre behavior that were given to Chief Lewis; copies of documents Plaintiff authored (including the September 5, 2009 e-mail Plaintiff sent to his coworkers, which Chief Lewis believed was intended to communicate an implicit threat); and documents about Plaintiff's personal background such as an incident in which the Illinois Department of Children and Family Services ("DCFS") was called to investigate Plaintiff having left two small children at home. (Friedman Decl., ¶ 6; Exhibit E, Deposition of Alan Friedman ("Friedman Dep.") Part I, 67:8-68:17, Ex. 6 to Friedman Dep.)

11. During Dr. Friedman's first meeting with Plaintiff on September 14, 2009, Dr. Friedman explained that the results of the FFD would be disclosed to Chief Lewis, and that the purpose of the FFD was to determine whether he posed any threat to himself, his coworkers or

3

the general public. (Friedman Decl., ¶ 7.) Plaintiff executed consent forms acknowledging this and the voluntary nature of the FFD. (*Id.*)

12. Plaintiff also completed an intake questionnaire Dr. Friedman gave him in order to collect relevant background information. (Friedman Decl., ¶ 8.) Dr. Friedman questioned Plaintiff about the events that led to the FFD, but Plaintiff refused to accept any accountability for his actions and denied any stress in the workplace, ever losing his temper and becoming emotional in front of his coworkers. (*Id.*)

13. By Plaintiff's second session with Dr. Friedman on September 15, 2009, Dr. Friedman had received computerized, blindly-scored results of two of the standardized personality assessments Plaintiff had taken the day before, the Minnesota Multiphasic Personality Inventory 2 ("MMPI-2") and the Personality Assessment Inventory ("PAI"). (*Id.*, ¶ 9.)

14. Both of these tests have a set of validity scales and a set of clinical scales. (*Id.*) The validity scales generally measure the test-taking approach and if these scales invalidate the test results, the clinical sales cannot be interpreted. (*Id.*) Plaintiff's results on both the MMPI's and PAI's validity scales indicated Plaintiff was not answering the tests in an honest and candid fashion and was "faking good," therefore Dr. Friedman could not interpret the clinical results. (Friedman Dep., 97:18-98:8; Friedman Decl., ¶¶ 10-11.)

15. For example, on the MMPI-2, Plaintiff grossly elevated the "Lie" Scale ("L-Scale"), the "Superlative" Scale ("S-Scale") and the "Positive Malingering" Scale ("MP-Scale"). (Friedman Dep., 98:9-105:15.) The "L-Scale" or "Lie Scale," for example, measures one's willingness to admit to having any problems or faults that most people would admit to and transparency in test-taking. (*Id.*, 103:22-105:4.) Plaintiff scored 83 on the L-scale, more than

three standard deviations above the norm of 50, which indicated that he was faking good. (*Id.* 104:5-16, 105:4.) Dr. Friedman interpreted Plaintiff's score to mean that he was saying "I'm not going to admit that I have ever done anything wrong. I'm perfect, I'm superlative," which is a very strong indicator that Plaintiff was not answering honestly on the MMPI-2. (*Id.*, at 105:1-4.)

16. Taken together, the elevated scores on the L-scale, the S-scale, and the MP-scale demonstrated that Plaintiff was attempting to mask the presence of any psychological problems by overstating positive traits far beyond what is typically endorsed in the FFD scenario. (Friedman Decl., ¶ 10, Ex. 10 to Friedman Decl.) Indeed, Dr. Friedman testified at length about the numerous indicators on Plaintiff's MMPI-2 results which led him to believe that Plaintiff was not cooperating with the FFD and that his MMPI-2 clinical scales should not be interpreted. (Friedman Dep., 97:9-105:15; Friedman Decl., ¶ 10.) Ultimately, Dr. Friedman did not interpret the clinical scales on the MMPI-2 because these factors rendered them incapable of interpretation. (*Id.*)

17. Similarly, Plaintiff's results on the PAI showed an elevated "positive impression management" score, which suggested "considerable defensiveness in responding." (Friedman Decl., ¶ 11, Ex. 11 to Friedman Decl.) In fact, the narrative that accompanied the PAI results noted Plaintiff "appears motivated to portray himself as being exceptionally free of common shortcomings to which most individuals will admit." (*Id.*) It also warned: "Regardless of the cause, THE TEST RESULTS ARE UNLIKELY TO BE A VALID REFLECTION OF THE RESPONDENT'S EXPERIENCE." (*Id.*) (emphasis in original). This defensive pattern of responding compromised the validity of the PAI test. (Friedman Dep., 149:14-21.)

18. During the September 15, 2009 meeting, Dr. Friedman informed Plaintiff that he was going to administer a third test, the M-Pulse Inventory, and that Plaintiff should be more

5

open and honest in answering those questions. (Friedman Decl., ¶ 12.) Dr. Friedman also sent the results of the M-Pulse Inventory to be scored by a blind computer. (*Id.*, ¶ 13.) Those results also showed significantly elevated "Impression Management" scale scores, showing that Plaintiff still was not answering honestly on the inventory. (*Id.*)

19. The reason Dr. Friedman administered a battery of three tests was to ensure that the test-taker's results on a given test are accurate and reliable. (Friedman Dep., 55:7-23; Friedman Decl., ¶ 17.)

20. During Plaintiff's third and final session with Dr. Friedman on September 18, 2009, Dr. Friedman attempted to ask Plaintiff additional verbal questions, but had to ask the same question several times before receiving any answer at all from Plaintiff. (Friedman Decl., ¶ 14.) Dr. Friedman interpreted this behavior to indicate that Plaintiff was approaching the FFD in a very defensive and uncooperative manner. (*Id.*)

21. Dr. Friedman also interviewed three NUPD members who were at the August 25, 2009 roll call meeting. (Friedman Decl., ¶ 15.) All three of these witnesses reported that, contrary to Plaintiff's account of the incident, Plaintiff's behavior during the roll call was uncharacteristically loud, hostile and emotional. (*Id.*)

22. Dr. Friedman relied on numerous factors in concluding that Plaintiff did not cooperate with the FFD, including the fact that Plaintiff's job required him to be mentally fit to carry a gun; Plaintiff's defensive demeanor throughout the in-person meetings; the discrepancy between Plaintiff's version of the events that led to his FFD and the version provided by every other witness to the events; and the fact that *all* three of his results on the standardized tests indicated that he was not candid and honest in answering the questions. (Friedman Decl., ¶ 16.)

23. Dr. Friedman concluded that Plaintiff's Chinese-American ethnicity did not impact his MMPI-2 scores. (Friedman Decl., ¶ 20.) First, through his experience as a researcher and clinician specializing in fitness for duty evaluations and the MMPI-2 in particular, Dr. Friedman was aware that the impact of a test-taker's race and/or ethnicity on the results of the MMPI-2 is diminished according to that person's level of acculturation into American society. (*Id.*) Based on the information received during the FFD, Dr. Friedman was of the opinion that Mr. Lee is fully acculturated into American society. (*Id.*) However, even if Dr. Friedman adjusted his elevated L-score to account for cultural factors, the validity scales still would have been invalid and could not be interpreted. (*Id.*)

24. Dr. Friedman did not give Plaintiff an opportunity to retake any of the tests administered during the FFD because Dr. Friedman does not employ a re-test method in his protocol for administering FFDs. (Friedman Decl., ¶ 18.)

25. Based on the other factors he considered, even if Dr. Friedman had not administered the MMPI-2 to Plaintiff, and had only relied on the results from the M-Pulse and PAI, documents reviewed, collateral interviews, and his behavior during the FFD, he would have reached the same conclusion that Plaintiff was uncooperative with the FFD process. (Friedman Decl., ¶ 19.)

26. Plaintiff has offered James Butcher, Ph.D.'s ("Dr. Butcher") opinions about the MMPI-2 in support of his motion for summary judgment. *See* Dkt. 139, Plaintiff's Rule 56.1 Statement of Facts in Support of Motion for Summary Judgment ("PSOF"), ¶¶ 52-55.) Dr. Butcher's opinions essentially boil down to the following:

- Plaintiff's results on the MMPI-2 show an effort to present favorably on the MMPI-2. (Ex. F, Deposition of Dr. Butcher ("Butcher Dep.") 130:11-20, Exhibit 5 to Butcher Dep., p. 4, "Conclusions");

- Plaintiff's defensive pattern of responding on the MMPI-2 *may* result from several factors such as lack of insight, minority status and concerns, or an effort to appear well-adjusted in the workplace. (*Id.*, 130:25-131:-12, Ex. 5, p. 4);

- The high L-scale elevation should not be viewed as a *general tendency* to lie, fabricate or deceive others on the part of the individuals *in their day to day activity*. (*Id.*, Ex. 5, p. 4.) (emphasis added);

- In order to obtain a more effective and open test participation, a re-evaluation using the test-retest method is recommended and common in work-place assessments. (*Id.*).

27. The only data Dr. Butcher considered in reaching these conclusions was a one-page "clinical and validity scale profile," only one of the 8-pages of Plaintiff's blinded computerized MMPI-2 results. (Butcher Dep., 63:11-64:13, Exhibit 6 to Butcher Dep.) Dr. Butcher did not review the 7 other pages of the MMPI-2 results, the accompanying narrative or any of the results of the other two tests that Plaintiff took during the FFD. (Butcher Dep., 36:12-21, 37:22-38:10, 64:2-12.)

28. Dr. Butcher is aware that Plaintiff is of Chinese-American descent, but does not know where he was born and raised. (*Id.*, 30:10-23.) Dr. Butcher did not personally examine or interview Plaintiff and admittedly does not know anything about Plaintiff or his background. (*Id.*, 29:23-31:5.) Dr. Butcher does not know whether Plaintiff speaks Chinese, his socioeconomic status, his current profession, or anything about Plaintiff's family. (*Id.*, 30:10-31:16, 41:25-42:20.)

29. Dr. Butcher is unaware of what the claims in this lawsuit are. (*Id.*, 30:6-9.) He does not know why the University required Plaintiff to undergo a FFD or any of the circumstances surrounding that decision. (*Id.*, 32:24-33:9.)

30. Dr. Butcher testified that when he performs FFDs he considers additional background information including job history and personal background details, however, he does not know any of the background information that Dr. Friedman collected and reviewed in

connection with the FFD. (*Id.*, 33:18-35:22, 37:8-40:5.) Dr. Butcher does not even know whether Dr. Friedman interviewed Plaintiff during the FFD and did not review any of Dr. Friedman's notes from that evaluation, nor did he review the notes Plaintiff himself took during the evaluation. (*Id.*, 36:22-37:7.)

31. Plaintiff deposed Dr. Friedman at length about the FFD, over the course of two days, yet Dr. Butcher did not review any of Dr. Friedman's testimony. (*Id.*, 63:20-64:13.)

32. Dr. Butcher knew that three psychological assessments, in total, were administered during the FFD. (*Id.*, 36:3-37:7.) He admittedly did not look at any of the results of those other two tests because he was told by Plaintiff's attorney that the MMPI was a "key part of the evaluation," and that Dr. Friedman "largely relied" on Plaintiff's elevated L-scale in making his decision. (*Id.*, 35:24-36:21, 38:4-39:1.) However, Dr. Butcher does not know what Dr. Friedman's decision was. (*Id.*, 38:24-39:25)

33. Dr. Butcher acknowledged that "the most important step in MMPI-2 profile interpretation is the initial one of determining whether the profile contains valid, useful and relevant information about the client's personality and clinical problems. If a profile is considered 'invalid' based on these validity measures then the clinical scales are not interpreted." (Butcher Dep., Ex. 5, p. 1.)

34. Dr. Butcher testified that the L-scale measures deceit in test taking, which some people refer to as "faking good." (Butcher Dep., 57:19-58:3, 60:4-14, 66:2-25, 97:1-98:1.) He also testified that an 83 on the L-scale is a very high score that tells you "not to interpret the profile" or "make any conclusions from the profile as it stands." (Butcher Dep. 89:13-23.) As Dr. Butcher explained, "[i]f the L score is greater than 65, the individual is claiming virtue not found among people in general." (Butcher Dep., Ex. 5, p. 2.)

35. Although Dr. Butcher opines in his written report that race may affect an L-scale score, when on cross-examination Dr. Butcher admitted that the literature he cited for that proposition actually reached the opposite conclusion; that is, that race did *not* play a role in elevated lie-scale scores. (Butcher Dep., 119:4-126:4).

36. When confronted with research on L-scale scores in Asian populations in the U.S., Dr. Butcher again was forced to admit that there is no evidence that supports the proposition that acculturated Asians (i.e., those born, raised and educated in the U.S., like Plaintiff) tend to have even moderately inflated L-scale scores, let alone the kind of grossly elevated score Plaintiff demonstrated. (*Id.*, 128:7-129:25, 131:3-133:25)

37. Dr. Butcher also explained that he and other experts on the MMPI-2 have developed the "test retest" method as a strategy designed to rule out aberrant validity scales that may be caused by an effort to present as well adjusted in the applicant setting. (*Id.*, 99:18-100:17.) He further testified, however, that whether this method is truly valuable in the personnel setting is still an open question.

Dated: February 10, 2012                    Respectfully submitted,

                                            By:    s/ Jenny R. Goltz
                                                   One of the Attorneys for Defendant
Joseph E. Tilson                                   NORTHWESTERN UNIVERSITY
Anneliese Wermuth
Jenny R. Goltz
MECKLER BULGER TILSON
  MARICK & PEARSON LLP
123 North Wacker Drive, Ste. 1800
Chicago, Illinois 60606
(312) 474-7900 – Telephone
(312) 474-7898 – Facsimile

M:\14092\pleading\NU MSJ\MOT-Sum-Judg. (SOF).unredacted.doc

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on February 10, 2012, a copy of the **Defendant's Local Rule 56.1(b)(3)(C) Statement of Additional Undisputed Material Facts in Opposition to Plaintiff's Motion for Summary Judgment** was filed electronically with the Clerk of the Court using the CM/ECF system. The parties may access this filing through the Court's electronic filing system, and notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.



/s/ *Jenny R. Goltz*
Jenny R. Goltz