**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| **FREDERICK LEE** | Judge Kocoras |
| Plaintiff. | Magistrate Judge Mason |
| v. | Case No: 1:10-cv-01157 |
| **NORTHWESTERN UNIVERSITY** | Jury Demand |
| Defendant. | |

**PLAINTIFF'S RULE 56.1 ADDITIONAL UNDISPUTED MATERIAL FACTS**

NOW COMES Plaintiff Frederick Lee, hereby submits Rule 56.1(b)(3)(C) Statement of Additional Undisputed Material Facts in Opposition to Defendant Northwestern University's Motion for Summary Judgment as set forth below:

1. Plaintiff incorporates and resubmits herein all undisputed material facts in Plaintiff's Statement of Material Facts in Support of its Motion for Summary Judgment (Document No. 139), supporting exhibits to those facts (Document No. 140), and all supplemental facts. (Document No. 149).

2. Plaintiff answered as honestly he believed to all questions based on his understanding of the questions. (Lee Decl.,¶1) Plaintiff answered the questions according to the instructions of the test—"Read all questions and decide whether it is an accurate statement about you. Give **your own opinion** of yourself." (Pla. Ex E) All questions can be interpreted in different ways and when plaintiff was taking the fitness for duty tests, there was nobody there to explain each question to him. (Lee Decl.,¶1). Plaintiff denied any stress during the specific moment he was taking the test. *Id*. The test did not specify "did you feel stress when you were being discriminated and retaliated against when you were working on such and such day?" *Id*. All the test was asking was general questions that he simply answered honestly based on the way he was feeling the moment I was taking the test. *Id*.

3. Part of the notes that were released to NU attorneys were privileged notes between plaintiff and his attorney that were not meant to be turned over. (Lee Decl., ¶2) The notes of which plaintiff wrote "severe emotional distress" were from a conversation plaintiff had with his attorney where his attorney was

advising plaintiff that he would have to prove that they had inflicted severe emotional distress onto me. *Id*. Plaintiff simply took notes about the conversation in the same notebook that plaintiff ended up using to take notes on his meeting with Dr. Friedman. *Id*. NU attorneys mistakenly assumed that he wrote down severe emotional distress in my notebook while he was speaking with Dr. Friedman which is false. Id. Plaintiff took those notes a few days prior to my meeting with Dr. Friedman. *Id*.

4. Plaintiff told Dr. Friedman that he was not experiencing any stress at that current moment that he was speaking with him because at that moment, plaintiff prepared myself mentally and emotionally to show that he was perfectly fit for duty. (Lee Decl., ¶3)

5. Plaintiff practices meditation and believes in self-healing and Buddhism to handle stress. (Lee Decl., ¶4) Plaintiff does not believe in traditional treatment and medication like anxiety medication. *Id*. Plaintiff started seeing treatment advice for his stress after plaintiff started getting into more frequent arguments with his wife and once he was able to obtain government subsidized insurance as plaintiff had no medical coverage after he was terminated. *Id*.

6. At the August 25, 2009 roll call meeting, even though Smerdka & Kramarz clearly had their voices raised, Stoeckl did not tell them to lower their tone of voice. Plaintiff was silent most of the time that Smerdka and Kramarz were arguing and plaintiff obeyed all orders. Smerdka and Kramarz were hostile towards plaintiff. While plaintiff spoke loudly to them, he was no louder than how loud Kramarz and Smerdka were and he did not yell or shout. (Lee Decl., ¶5)

7. Plaintiff did not yell or shout in Gildron's office, was not at all emotionally charged, was not angry, hostile, nor threatening. He was polite and professional. (Lee Decl., ¶6)

8. Plaintiff did not communicate an implied threat in the email memo he sent to his colleagues. (Lee Decl., ¶7)

1. Plaintiff never believed that Kramarz wanted to kill him though he did feel he was hostile towards plaintiff and wanted to fight him. (Lee Decl., ¶8) Plaintiff clarified to Leah Gidron that he felt Kramarz might want to fight him, but not literally kill him. (Lee Dep., p.315, 20; p.316, 3-6)

2. Plaintiff has experienced severe emotional distress as a result of the dispossession of his personal property and the violation of his privacy. (Lee Decl., ¶9) He was not asked any specific questions in his deposition by Northwestern University's attorney's about whether this had caused me any emotional distress. *Id*. Had he been asked about this, he would have responded in the affirmative.

Moreover, the dispossession of his property for over six weeks contributed to his severe emotional distress. *Id*.

11. Plaintiff did not got back to my locker to retrieve my belongings because Dan McAleer told him was not allowed back on campus. (Lee Decl., ¶10)

12. Plaintiff's poetry and journal entries are not necessarily grounded in reality nor reflects his actual beliefs. (Lee Decl., ¶11) The biggest influence on the verses is whether words rhymed. *Id*. A review of all the writings and audio files will show that most if not all verses contain rap verses that rhyme. *Id*.

13. Plaintiff does not believe Chief Lewis did everything he could to remedy the shoe-throwing incident. (Lee Decl., ¶12) In particular, he never spoke with me about it or warn department members that such conduct would not be tolerated in the Department. *Id*. Plaintiff wrote the following passage:

> **The letter claims that the person who ordered the directive was Chief Lewis. But I have spoken personally with Chief Lewis on about 3 occasions in private. We spoke at times for over an hour long. I would voice to him my concerns with the department in regards to discrimination and harassment. He shares many parallel views to mine in regards to fixing the problem. He is a very good and wise man. And I can sense that he believes that I am very mature for my age and that I am a very truthful person. He knows there are many problems within the department in regards to racism and he is giving his greatest efforts to fix these problems. I personally do not believe that it was his personal decision to force me to attend this psychologist evaluation. <u>I believe that he was directed to do so by Human Resources in order to protect the University from a civil lawsuit</u>. (LEE PROD 1062)**

However, this was privileged information written and intended only for my attorney. NU inadvertently received these notes during discovery. *Id*. Nonetheless, The statement was true to plaintiff at the time plaintiff wrote it, which was before plaintiff was wrongfully terminated. *Id*. However, as this case has been going on and plaintiff has received more information about the decisions Chief Lewis has made to wrongfully terminate him, plaintiff's views on his character has changed. *Id*. Plaintiff strongly believes he is just there as a cover up to pretend that he cares about preventing racial discrimination at NUPD, when in actuality he is there as a conduit/voice of HR to retaliate against any officers that stand against it and speak up about it. *Id*. Case in point: he has never taken any action against Lt. Parashis for making racist remarks to African American officers and creating a training schedule that Lewis himself has acknowledged "did not take full advantage of the degrees of diversity within the department in terms of gender, in terms of sexual orientation, in terms of race, in terms of ethnicity and in terms of nationality." (Pla. Ex. B, Lewis Dep., p.126, 12-18) Rather than confront the problem, Lewis viewed the re-scheduling as an "opportunity to enhance the opportunity for the richness of the experience." (Id. at p.127, 5-5)

14. Plaintiff adopted the pseudoname "Wise Flow" to remain anonymous and

protect his privacy so nobody knew he was the author. (Lee Decl., ¶13)

15. The quality of plaintiff's relationships and life has been severly diminished at times through increased arguments with his wife and remaining depressed. (Lee Decl., ¶14)

16. Kramarz admitted he was surprised he was placed on administrative leave. (Pla. Ex. A, Kramarz Dep., p.107, 10-12)

17. Kramarz admitted that plaintiff never threatened him. (Pla. Ex A, Kramarz Dep., p.6, 18-19)

18. Lieutenant Parashis testified he has never seen plaintiff threaten anyone. (Pla. Ex. C, Parashis Dep., p.102, 3-5)

19. Pirtle admitted that plaintiff's email to his colleagues was not negative as plaintiff "wasn't communicating in a way in which he was harassing anybody in that respect." (Pla. Ex. D, Pirtle Dep., p.l80, 2-7)

20. Gidron described ▓▓▓▓ as "**extremely upset about Grievant's allegations and appearing noticeably agitated**" when she met with Kramarz as part of her investigation into the shoe throwing incident. (Pla. Ex 3, Gidron Report)

21. Lewis testified that plaintiff "caused[ed] fear and apprehension on [Leah Gidron] during her meeting Frederick Lee." (Pla. Ex. B, Lewis Dep., p.171, 11-120) Yet, Leah Gidron completely omits such information in her declaration and stated nothing about having been in any fear or apprehension from plaintiff. (*See* Def. Ex G, Girdon Decl.)

22. Lewis testified that he did *not* know it to be impossible that plaintiff answered the questions as he honestly believed. (Pla. Ex B, Lewis Dep., p.295, 3-4).

23. There were never any periodic searches of plaintiff's locker during his employment. (Lee Decl., ¶15)

24. Lewis placed ▓▓▓▓ on administrative leave December 2009 (just before ▓▓▓▓ left the University) due to what he describes was "part of a threat assessment process," but this was at least six weeks **after** plaintiff had been terminated October 21, 2009. (Pla. Ex. B, Lewis Dep., p.84, 13-14; Pla. Ex. A, Kramarz Dep., p.108, 2-8; p.5, 4-5; p.6, 8-10)

25. Lt. Parashis believed that Lee kept barbells near his locker. (Pla. Ex. C, Parashis Dep., p.123, 11-12)

26. Lt. Parashsis did not recall plaintiff ever appearing to him to be under stress. (Pla. Ex. C, Parashis Dep., p.121, 2-7)

27. On August 18, 2009, plaintiff sent a letter to Lewis and Davis complaining about the throwing of his shoes in the locker room. (Lee Decl., ¶17)

28. Before plaintiff filed any discrimination claims, he was very outgoing with other officers and got along with everybody and had many regular conversations with his fellow officers. (Lee Decl., ¶15) After he complained about discrimination in April 2008, he started to become quiet because he felt that those he complained against had hostility towards me. *Id*. This made plaintiff feel uncomfortable around those he complained against and those whom were very close friends with those he complained of. *Id*.

29. Plaintiff never filed a complaint with the OEOA—no such office with that name existed at the time. (Lee Decl., ¶18) Plaintiff complained to the University's Equal Employment Opportunity (EEO) Office. *Id*.

30. On September 17, 2009, Dr. Friedman sent an email to Pirtle indicting that he saw a problem "spinning into becoming larger issues for the University" and requested a conference call with Larry Barton, a crisis management expert[1]. (Pla. Ex. 54) Pirtle replied by email: "Thank you so much Dr. Friedman, *Pam Beemer welcomes your assistance*.[2]" *Id*.

31. On September 18, 2009, Pam Beemer ("Beemer"), Associate Vice President of HR, attended a "crisis management" conference meeting **in her office** with Dr. Friedman, Larry Barton (crisis management expert) by phone, Pam Pirtle, Director of defendant's Equal Opportunity Office ("Pirtle"), and Lewis. (Pla. Ex. 54; Pla. Ex. D, Pirtle Dep., p.109, 15-21)

32. Parashis testified that there are no incidents, complaints, direct knowledge, or indirect knowledge he has that suggests plaintiff is not fit to serve on the NUPD. (Parashis Dep., p.135, 9-20)

---

[1] Pirtle testified: "We contacted Dr. Barton, as I stated earlier, because Dr. Friedman thought might be helpful to us to I guess determine or ascertain from him how to best handle employees who might be dealing with stress and be helpful to them. I mean, that's essentially what it was for." (Pla. Ex. D, Pirtle Dep., p.108, 8-13) She further stated that in relation to crisis management, we did in the context of dealing with an employee who might be stressed, how to best identify those, you know, kinds of situations and how to help remedy them." Id. However, her reason for the meeting is implausible given that Dr. Barton is a reknown crisis management expert who helps organizations deal with crisis reputational harm. He wrote the books *Crisis In Organizations and Crisis in Organizations II* and that fact that the meeting was planned on the day and occurred the next day after plaintiff drafted a memo called "Stop NUPD Racial Profiling! Speak Up and Help Make a Change!" which was distributed electronically by others to minority groups on campus. It should be noted that Pirtle's testimony has been impeached before with contradictory statements to the documented evidence during her deposition in another Northwestern case: Guo v. Northwestern University, Case No. 10-cv-5226.

                                                               Respectfully Submitted,

                                                               FREDERICK LEE

                                                               /s/ Justin London

LAW OFFICES OF JUSTIN LONDON
1920 N. Maud, Ste. A
Chicago, Illinois 60614
Phone: (773) 528-1433
Attorney No:   6293251

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on February 10, 2011, **Plaintiff's Response and Opposition to Defendant's Motion for Summary Judgment** was filed electronically with the Clerk of the Court using the CM/ECF system. The parties may access this filing through the Court's electronic filing system, and notice of this filing will be sent to the following parties by operation of the Court's electronic system.

                                              Anna Wermuth
                                              Jenny Goltz
                                              Meckler Bulger Tilson Marick & Pearson
                                              123 N. Wacker Drive, Suite 1800
                                              Chicago, Illinois 60606
                                              anna.wermuth@mbtlaw.com
                                              jenny.goltz@mbtlaw.com

                                              /s/ Justin London
                                                  Justin London

Justin London (#6293251)
LAW OFFICES OF JUSTIN LONDON
1920 N. Maud, Ste. A
Chicago, Illinois 60614
Phone: (773) 528-1433