UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FREDERICK LEE,              )
                              )
            Plaintiff,     )
                              )
     vs.                 )         10 C 1157
                              )
NORTHWESTERN UNIVERSITY,  )
                              )
           Defendant.    )

## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Plaintiff Frederick Lee's ("Lee") and Defendant Northwestern University's ("Northwestern") cross-motions for summary judgment. For the reasons set forth below, Lee's motion for summary judgment on Counts I and II is denied, and Northwestern's cross-motion on these counts is granted. Lee's remaining claims are dismissed without prejudice.

## BACKGROUND

Lee, a Chinese-American male, was employed by Northwestern as a police officer from September 2005 until he was terminated in October 2009. In April 2008, Lee complained of racist and derogatory remarks made by three fellow officers to Northwestern's Office of Equal Opportunity and Access (the "EOA Office"), a division of Northwestern's Human Resources Department ("HR"). Lee suggested that he would

consider his complaint resolved if he received apologies from the alleged offenders and if Northwestern personnel were required to undergo discrimination sensitivity training. Each of the officers apologized, and the EOA Office conducted sensitivity training. Lee was not exposed to any racially offensive comments thereafter.

**The Locker Room Incident**

On August 18, 2009, Lee noticed that three pairs of his shoes were scattered throughout various parts of the locker room coach house. Lee believed that other officers had intentionally strewn his shoes around the locker room and that he was targeted because of his race. Lee reported this incident to his supervisors and also wrote a memo describing the incident to Commander Darren Davis ("Cdr. Davis") and Chief of Police Bruce Lewis ("Chief Lewis").

At a roll call meeting on August 25, 2009 (the "Roll Call Meeting"), Lee expressed his ire with the locker room incident and openly questioned whether Sergeant Steve Stoeckl ("Sgt. Stoeckl"), Officer Frank Walsh, ("Walsh"), or Officer David Kramarz ("Kramarz") were involved. During this meeting, Lee and Officer Kasia Smerdka ("Smerdka") raised their voices, and Sgt. Stoeckl told Lee to lower his voice. Sgt. Stoeckl prepared a report of the incident, in which he stated that no foul language was used, no discriminatory statements were made, and no threats were communicated. Two days later, Lee complained to Chief Lewis about the incident.

On August 28, 2009, Lee met with Leah Gidron ("Gidron"), an investigator in Northwestern's EOA Office. Lee indicated that he believed other officers were targeting him because of his race and that Kramarz wanted to harm him. During this meeting, Pamela Pirtle ("Pirtle"), the Director of Northwestern's EOA Office, overheard Lee yelling but soon realized that Lee's yelling was not directed at Gidron. Nevertheless, Pirtle reported the incident to Chief Lewis.

Gidron conducted an investigation into Lee's allegations and ultimately concluded that his complaints of discrimination were unsubstantiated. In her investigation report, Gidron recommended to Northwestern that Lee submit to confidential counseling to help him cope with his anger and distrust of his co-workers. Northwestern did not follow Gidron's recommendation, and Lee never received any confidential counseling.

On September 5, 2009, Lee sent an e-mail to the officers on his shift in which he expressed his displeasure with the way some of his colleagues had treated him. In this e-mail, Lee encouraged the recipients to maintain a professional and mutually respectful working environment and stated that he would not tolerate disrespect from his fellow officers. Chief Lewis stated that he believed that this e-mail communicated an implicit threat and posed a risk to the police department.

**The Fitness-For-Duty Evaluation**

On September 10, 2009, Chief Lewis issued Lee a letter from Deputy Chief Daniel McAleer ("Dep. McAleer"). The letter notified Lee that he was being placed on administrative leave and ordered Lee to submit for a fitness-for-duty evaluation ("FDE"). Dep. McAleer's letter cautioned Lee that failure to submit for an FDE would be considered insubordination and would result in disciplinary action. The letter also prohibited Lee from discussing the matter with other officers and supervisors. Lee was the only officer that Chief Lewis had ordered to submit to an FDE in his tenure as Chief of Police at Northwestern.

Dr. Friedman, an associate professor of clinical psychiatry and behavioral sciences at the Northwestern University's Feinberg School of Medicine, conducted Lee's FDE over three days. Dr. Friedman administered three psychological tests: the MMPI-2, the PAI, and the M-Pulse. Each of these tests contains a built-in validity scale to determine whether the test taker is being truthful in his answers. Lee's scores on the validity scales indicated that Lee was not answering the questions honestly and candidly. Dr. Friedman also observed that Lee was behaving defensively during the FDE. For example, Lee had been taking notes and "writing down everything that [Dr. Friedman] asked." Dr. Friedman testified that he had never encountered this behavior in any of the hundreds of FDEs that he had previously conducted in his thirty-

year career.  Additionally, Dr. Friedman noted that Lee showed significant reluctance to answer his questions and would only do so after considerable prodding.

Dr. Friedman ultimately concluded that Lee was "faking good," i.e., overstating positive traits beyond which is typically endorsed in an FDE, and therefore not fully cooperating with the administration of the tests.  As a result, the test results were invalid and Dr. Friedman was unable to draw a conclusion as to whether Lee was fit for duty. Chief Lewis recommended that Lee be terminated for insubordination for failing to comply with the FDE, and his recommendation was approved on October 15, 2009.  On October 20, 2009, Chief Lewis sent Lee notice of his termination.

**Lee's Personal Affects**

Lee kept several personal items in the locker room at the police station, including a laptop computer, personal audio recordings on compact discs ("CDs"), a weight set, personal journals, and a voice recorder.  All of Lee's personal property was stored in his locker with the exception of the weight set, which was stored in a drawer elsewhere in the locker room.  Sometime after he was placed on administrative leave, Lee attempted to contact Dep. McAleer to arrange a time for Lee to retrieve his property. Lee claims that Dep. McAleer denied his requests.  On October 22, 2009, all of Lee's property was mailed to his residence except the barbell set.  During the course of this litigation, Northwestern attempted to return the barbell set but Lee refused to accept it.

- 5 -

Cdr. Darren created an inventory of the property removed from Lee's locker, made copies and read several portions of Lee's journals and listened to some of the audio files on the CDs. Cdr. Darren delivered copies of these materials to Dr. Friedman without first consulting with Lee.

On September 23, 2011, Lee filed a six-count Third Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964 and multiple torts under Illinois law. Upon the completion of discovery, Lee and Northwestern filed cross-motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v. Cook Cnty.*, 563 F.3d 598, 602-03 (7th Cir. 2009). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). When faced with cross-motions for summary judgment, the court views all facts and draws all reasonable inferences in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

## DISCUSSION

Lee's Third Amended Complaint alleges two counts of employment discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and state law claims alleging conversion, trespass to chattels, intentional infliction of emotional distress ("IIED"), and intrusion upon seclusion. Prior to assessing the merits of the parties' cross-motions, we first consider an evidentiary issue raised by Northwestern.

## I.      Admissibility of Lee's Expert Report

Dr. Friedman conducted Lee's FDE and administered three psychological tests, one of which was the MMPI-2. The MMPI-2 contains several built-in validity scales that are designed to determine whether a test-taker is answering the questions truthfully. Lee's score on one of these validity scales, the L-Scale or "Lie Scale", was extraordinarily high, indicating that he was not being entirely truthful in his answers. The validity scales of the other psychological tests yielded similar results. Relying in large part on the validity scores, Dr. Friedman concluded that Lee had been uncooperative with the FDE. Chief Lewis stated that he based his decision to terminate Lee solely on Dr. Friedman's conclusions.

In support of his motion for summary judgment, Lee has submitted an expert report from Dr. James Butcher, Ph.D. ("Dr. Butcher"). Dr. Butcher opined that there

are several reasons why an individual may produce high L-scale scores, including religious background, cultural factors, and the reasons for which the individual was directed to take the MMPI-2. Northwestern seeks to exclude Dr. Butcher's expert opinions.

Lee seeks to introduce Dr. Butcher's report to criticize Dr. Friedman's findings and to support his claim that Chief Lewis's decision to terminate his employment for insubordination was pretextual. Even assuming the admissibility of the report at a trial on the merits, it does not supply a basis to conclude that Dr. Friedman's opinions were unreasonable or ill-founded. More significantly, it supplies no basis to infer that Chief Lewis acted unreasonably and unlawfully in relying on Dr. Friedman's conclusions to terminate Lee's employment. Evidence of pretext it is not.

We now turn to the merits of the parties' cross-motions for summary judgment on Lee's federal claims.

## II. Northwestern's Motion for Summary Judgment

Title VII prohibits an employer from discharging, retaliating, or otherwise discriminating against an individual because of that individual's race.[1] 42 U.S.C. §§ 2000e-2(a), 2000e-3; *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 809 (7th Cir.

---

[1] Retaliation claims under Title VII and Section 1981 contain similar elements and are routinely analyzed together. *Hobbs v. City of Chi.*, 573 F.3d 454, 459 n.1 (7th Cir. 2009) (citation omitted)..

2011).  A plaintiff alleging discrimination under Title VII may proceed under either the direct or indirect method.  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849-50 (7th Cir. 2008).  While the direct method requires evidence that "points directly" to a discriminatory reason for an employer's action, the indirect method allows a plaintiff to establish a rebuttable presumption of discrimination and shifts the burden on the defendants to rebut the presumption.  *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008).

## A.    Count I:  Retaliatory Discharge

In Count I, Lee maintains that Northwestern terminated his employment in retaliation for his complaints of racial discrimination.  Lee has attempted to establish retaliatory discharge through both the indirect and direct methods of proof.

### 1.    Indirect Method

To establish a claim of retaliatory discharge under the indirect method, Lee must establish a prima facie case of discrimination by showing that: (1) he engaged in a statutorily protected activity; (2) he was meeting Northwestern's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated individuals who did not engage in protected activity were treated more favorably. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citation omitted).  If Lee establishes a prima facie case of retaliation, the burden shifts to

Northwestern to articulate a non-discriminatory reason for its actions. *Id.* Should Northwestern meet this burden, Lee must present evidence that Northwestern's reason is pretextual. *Id.*

Northwestern maintains that Lee has failed to establish a prima facie case of retaliation because he has not identified any similarly situated individuals who were treated more favorably. Employees are similarly situated to a plaintiff if they are "directly comparable to the plaintiff in all material respects." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (internal quotation and citation omitted). Courts generally consider "if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (citation omitted). "Similarly situated" does not mean identical, though the employee who allegedly received more favorable treatment must at least share "a comparable set of failings" with the plaintiff.[2] *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003).

---

[2] Northwestern contends that only those individuals who failed to cooperate with an FDE or were otherwise insubordinate can be similarly situated to Lee because Lee was terminated for insubordination. Although Lee's FDE does not constitute an adverse employment action, it may nevertheless be considered when evaluating whether Lee was treated differently than those similarly situated.

Lee was required to submit to an FDE for allegedly violating Northwestern's "Courtesy Rule," which states that officers "shall be quiet, civil, orderly, and shall at all times, be attentive and zealous in the discharge of their duties, controlling their tempers and exercising the utmost patience and discretion." Lee contends that Kramarz, Smerdka, Lt. Parashis, and Sergeant Bob Wiley ("Sgt. Wiley") each violated the Courtesy Rule but were treated more favorably.

As a preliminary matter, Lt. Parashis and Sgt. Wiley were Lee's supervisors, and "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Patterson*, 589 F.3d at 366 (quotation omitted). Kramarz and Smerdka, on the other hand, dealt with the same supervisor as Lee and were subject to the same standards. The only issue, therefore, is whether Kramarz and Smerdka engaged in similar conduct as Lee.

It is undisputed that Smerdka raised her voice at the Roll Call Meeting but was not disciplined. Lee testified that Kramarz also raised his voice during the Roll Call Meeting. Additionally, Gidron's report indicates that on a separate meeting about the incident, Kramarz was "extremely upset about [Lee's] allegations and appeared noticeably agitated."

Although Lee has presented evidence that Kramarz and Smerdka were angry, we must consider whether their conduct rose to the same level as Lee's. Lee was not

required to undergo an FDE solely because he was angry at the Roll Call Meeting. Rather, Chief Lewis also considered Lee's e-mail and Gidron's report in reaching his decision to order Lee's FDE. These additional events are sufficient to distinguish Lee's conduct from that of both Kramarz and Smerdka.

In his e-mail, Lee stated that he would "not tolerate negativity and disrespect in any way" and that as long as people are respectful, he did "not anticipate any problems." Although Lee's therapist opined that the e-mail was positively worded, his opinion is not dispositive. As the Chief of Police, Chief Lewis had a duty to ensure that Northwestern's armed police officers did not pose a threat to themselves, other officers, or the general public. Lee's e-mail contained sufficiently threatening language to justify a precautionary FDE. Lee has not presented evidence that either Kramarz or Smerdka communicated a potential threat to other officers such that Chief Lewis would question their fitness for duty.

Moreover, Chief Lewis testified that he also based his decision to order an FDE on Gidron's report. Gidron reported that Lee believed that Kramarz wanted to harm him. When Gidron inquired as to whether Lee had made any efforts to express these feelings to Kramarz, Lee responded, "If someone hates you and wants to kill you, why would you hug the person?" Lee was so agitated during the meeting that Pirtle, another HR employee, heard Lee yelling loudly from Gidron's office and reported this incident

to Chief Lewis. Gidron's report called Lee's mental well-being into question, and she recommended that he submit to confidential counseling.

Lee has not identified any conduct on the part of either Kramarz or Smerdka to indicate that they engaged in similarly menacing behavior. Although Smerdka raised her voice at the Roll Call Meeting and Kramarz may have appeared noticeably agitated by Lee's allegations of discrimination, neither officer showed the same pattern of anger and hostility as Lee. Because Smerdka and Kramarz did not engage in similar conduct as Lee, they are not similarly situated to him in all material respects, and Lee has failed to establish a prima facie case of retaliation.

Even if Lee was able to establish a prima facie case, he has not demonstrated that Northwestern's reasons for his termination are pretextual. Northwestern maintains that it terminated Lee's employment because of his non-compliance with the FDE. Dep. McAleer cautioned Lee that failure to cooperate with the FDE would be considered insubordination. Dr. Friedman conducted the FDE and concluded that Lee had not provided honest and candid answers to the psychological exams and was therefore uncooperative with the FDE. Because Dep. McAleer advised Lee that failure to cooperate with the FDE would be considered insubordination, and Dr. Friedman concluded that Lee had not cooperated with the FDE, Northwestern has offered a

legitimate non-discriminatory reason for Lee's termination for insubordination. Accordingly, the burden shifts to Lee to establish that this reason is pretextual.

To show that an employer's reason for termination was pretextual, a plaintiff "must present evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). A court need only consider "whether the employer honestly believed the reason it has offered to explain the discharge." *Id.*

Lee's evidence of pretext is unavailing. First, Lee maintains that Chief Lewis had several alternatives to terminations, despite Dep. McAleer's warning that failure to cooperate with the FDE could result in disciplinary measures. For example, Lee submits that Chief Lewis could have ordered that Lee be re-tested. Dr. Butcher, an expert on the MMPI-2, noted that it is common practice in the employment setting for an employer to allow an employee to re-take the MMPI-2 if the results are initially inconclusive. Alternatively, Chief Lewis could have explored Gidron's recommendation of requiring Lee to submit to confidential counseling. Although the availability of these alternatives may suggest that Chief Lewis's decision was imprudent, it does not support Lee's claim that Chief Lewis's decision was pretextual. *See id.* (stating that a court need not concern itself with the accuracy or fairness of an employment decision).

- 14 -

Lee also suggests that he believed he was answering Dr. Friedman's questions honestly and that the MMPI-2 test manual cautions psychologists not to interpret high L-Scale scores as indicative of intentional deceit. Lee's argument misses the point for two reasons. First, Dr. Friedman did not rely exclusively on the results of the MMPI-2 to conclude that Lee was uncooperative. Rather, Dr. Friedman noted that Lee's demeanor during the interviews was highly defensive and that he would have to continually prod Lee to answer his questions. Additionally, Dr. Friedman administered two other psychological exams which also indicated a lack of candor in Lee's answers. Second, and more importantly, whether Dr. Friedman's conclusions were accurate has no bearing on the propriety of Chief Lewis's reliance on these conclusions. Chief Lewis is not a psychologist, and Northwestern employed Dr. Friedman to assist Chief Lewis in making an informed determination as to Lee's fitness for duty. The issue before the Court is not whether Lee was actually insubordinate, but whether Chief Lewis reasonably believed that he was. Lee has not offered any evidence to suggest that Chief Lewis's reliance on Dr. Friedman's conclusions was misplaced.

Lee has not provided sufficient evidence to create a genuine issue of material fact as to whether Northwestern's proffered reason for his termination was pretextual. Nor has he identified any similarly situated individuals who were treated more favorably.

Accordingly, Lee cannot succeed under the indirect method, and Northwestern's motion for summary judgment on Count I under the indirect method is granted.

## 2.    Direct Method

To succeed under the direct method, Lee must show: (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse employment action; and (3) a causal connection between the two. *Abuelyaman*, 667 F.3d at 813 (citation omitted).   Northwestern does not dispute that Lee's multiple complaints of discrimination constituted protected activity or that his termination was a materially adverse employment action.   Instead, Northwestern maintains that Lee has not established a causal connection between the two.

Under the direct method, a plaintiff may establish a causal connection by presenting a "'convincing mosaic' of circumstantial evidence" from which intentional retaliation could be inferred. *Coleman v. Donahue*, 667 F.3d 835, 860 (7th Cir. 2012) (quoting *Rhodes v. Ill. Dep't of Transp.* 359 F.3d 498, 504 (7th Cir. 2004)).   The Seventh Circuit has recognized three types of circumstantial evidence that a plaintiff may use to establish causation: (1) "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of retaliatory intent might be drawn;" (2) "evidence that the employer offered a pretextual reason for an adverse employment

action;" and (3) evidence "that similarly situated employees were treated differently."[3]

*Id.* (internal quotations and citations omitted).  We consider Lee's evidence from each

of the categories in turn.

Suspicious timing may be offered to support a plaintiff's claim if "an adverse

employment action follows close on the heels of protected expression." *Hicks v. Forest*

*Preserve Dist. of Cook Cnty., Ill.*, 2012 WL 1324084, at *5 (7th Cir. 2012) (citing

*Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)).  Here, less than two months

had passed between Lee's complaints of discrimination and his termination, and only

a few days passed between Lee's complaints and his placement on administrative leave.

Additionally, Chief Lewis made the decision to terminate Lee less than one week after

Lee sent a memo to Northwestern minority student groups to attend a meeting to voice

their concerns about discrimination by Northwestern police.  The temporal proximity

between Lee's complaints and Northwestern's actions suggests a discriminatory animus.

However, a significant intervening event occurred between Lee's final complaint to HR

and his termination: Lee's FDE.  Chief Lewis testified that he based his decision to

terminate Lee on the results of the FDE, and as discussed in greater detail above, Lee

has failed to provide any evidence that Chief Lewis's decision was pretextual.

---

[3]  The categories of permissible circumstantial evidence under the direct method of proof are similar to the elements under the indirect method of proof, and the analyses therefore overlap. *Coleman*, 667 F.3d at n.8.

Finally, as discussed above, Lee has failed to identify any similarly situated individuals who were treated more favorably. Ultimately, Lee's relevant circumstantial evidence consists entirely of suspicious timing, which alone is generally insufficient to establish a casual relationship. *Coleman*, 667 F.3d at 860-61. Additionally, Lee's lack of candor during the administration of the FDE was a significant intervening event that outweighs his allegations of suspicious timing. The undisputed facts therefore establish that there was no causal connection between Lee's complaints of discrimination and his termination, and Northwestern is entitled to summary judgment on Count I under the direct method.

As Lee has failed to establish a genuine issue of material fact on his claims of retaliatory discharge under either the direct or indirect method, Northwestern's motion for summary judgment on Count I is granted.

## B. Count II: Retaliation

In Count II, Lee maintains that Northwestern retaliated against him for his discrimination complaints by banning him from entering Northwestern's campus, barring him from speaking with anyone about his situation, coercing him to see a psychologist, and placing him on administrative leave. Northwestern argues that none of its actions amount to an adverse employment action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an

employee unhappy is an actionable adverse action." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). The Seventh Circuit has articulated three general categories of actionable adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a lateral transfer reduces the employee's career prospects; and (3) cases in which the employee's work conditions are altered in such a way that she is subjected to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace. *Id.* at 911 (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)).

Northwestern's actions do not fall into any of these categories. Lee's allegations that Northwestern prevented him from entering its campus or speaking with anyone regarding his situation did not affect the financial terms of Lee's employment, nor did they significantly alter the conditions of his employment in such a way that his workplace became degrading, humiliating, or unsafe. Although Lee was placed on administrative leave pending an evaluation of his fitness for duty, Lee continued to receive his salary during this period. The Seventh Circuit has explicitly held that placing an officer on paid administrative leave does not constitute an actionable adverse employment action. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786-87 (finding that a university police department's placement of an officer on paid

administrative leave pending the results of fitness-for-duty psychological examination did not constitute a materially adverse action).  Because Northwestern's actions did not constitute an adverse employment action, Lee cannot succeed on his retaliation claims under either the direct or indirect methods as a matter of law.  Accordingly, summary judgment on Count II of Lee's complaint is granted in favor of Northwestern.

Chief Lewis was confronted with an employee who visibly demonstrated anger and hostility towards his co-workers.  Moreover, Northwestern's officials were not dismissive of Lee's complaints of discrimination.  To the contrary, Gidron fully investigated Lee's complaints, adhering to the protocols established by Northwestern for that very purpose.  When Lee transmitted his e-mail to others, including his co-workers, the text of the e-mail could reasonably have been interpreted as containing an implied threat.  Lee's position as a police officer required that he carry a firearm, and Chief Lewis had a duty to ensure Lee's mental fitness in light of his hostile behavior.

The FDE led Dr. Friedman to conclude that Lee did not cooperate with the testing procedure.  His inability to draw a conclusion as to Lee's fitness for duty supplied a basis for Chief Lewis to conclude that Lee was not fit to continue, particularly when Lee had been apprised of the consequences of failing to cooperate with the FDE.  It was eminently reasonable and prudent for Chief Lewis to rely on that

belief.  Any subsequent criticism of Dr. Friedman's work by Lee's expert in no way supports the notion that the decision to terminate Lee was pretextual.

Because Northwestern has established that there is no genuine issue of material fact such that it is entitled to judgment as a matter of law on Counts I and II, Northwestern's motion for summary judgment on these counts is granted, and Lee's cross-motion for summary judgment is denied.

## III.    State Law Claims

In addition to his federal retaliation claims, Lee asserts four state law claims: conversion (Count III), trespass to chattels (Count IV), intentional infliction of emotional distress (Count V), and intrusion upon seclusion (Count VI).  Generally, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits." *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010) (internal quotation and citation omitted).  A court may nevertheless consider the pendant state law claims if "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009) (citation omitted).

Although the parties have completed discovery and briefed cross-motions for summary judgment on Lee's state law claims, there would be little duplication of effort

by requiring the parties to present these matters to an Illinois state court. The parties would not be required to repeat discovery or even draft new cross-motions for summary judgment. Therefore, we decline to exercise supplemental jurisdiction over Lee's remaining state law claims.

## CONCLUSION

Based on the foregoing, Lee's motion for summary judgment is denied in its entirety. Northwestern's motion for summary judgment is granted on Counts I and II. The Court declines to exercise supplemental jurisdiction on Lee's remaining claims. Accordingly, Counts III through VI are dismissed without prejudice to Lee's refiling in state court.

Charles P. Kocoras
United States District Judge

Dated:   May 24, 2012